IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
—BROWNSVILLE DIVISION—

United States District Court
Southern District of Texas
RECEIVED Entered

DEC 0 4 2008

Michael N. Milby, Clerk of Court

| | |
|---|---|
| MARY KATHRYN ROTH, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF JACOB WARREN ROTH, DECEASED; AND FRANK RONALD ROTH, INDIVIDUALLY, Plaintiffs, <br><br> v. <br><br> KIEWIT OFFSHORE SERVICES, LTD.; KEPPEL AMFELS, INC. (USA); RAYTHEON COMPANY; AND THE BOEING COMPANY, Defendants. | CIVIL ACTION NO. 07-CV-154 <br> Rule 9(h) Admiralty |

## MEMORANDUM OPINION AND ORDER

### I.   FACTUAL BACKGROUND

Pending before this court is Plaintiff's Motion to Remand. The Plaintiffs are the parents of Jacob Warren Roth ("Mr. Roth"), the decedent, in their individual capacities, and as representatives of Mr. Roth's estate. They seek damages under various tort theories, including negligence and gross negligence. The Defendants are four defense contractors involved in the modification of a semi-submersible drilling platform called the SBX-1, on board which the accident leading to Mr. Roth's death transpired. The SBX-1 was originally constructed in Vyborg, Russia in 2002 as an oil drilling rig for a Norwegian company, Moss Maritime ("Moss"). Defendant Boeing Company ("Boeing") purchased the oil drilling rig from Moss in 2003 for future transfer to the U.S. Department of Defense's Missile Defense Agency. Boeing was tasked with converting the oil drilling rig into a carrier for a sea-based missile tracking radar, for a final destination in Adak, Alaska, as part of the

Missile Defense Program. To complete this sizeable project, Boeing contracted with defendant Raytheon Company ("Raytheon") to design and construct the radar component of the SBX-1. Defendant Keppel Amfels, Inc. USA ("Keppel Amfels") was contracted to modify the oil drilling rig so that it could bear the weight of the massive missile tracking radar. Defendant Kiewit Offshore Services ("Kiewit") was contracted to install the radar on the SBX-1. Keppel Amfels did its work at its yard in Brownsville, Texas. Kiewit was to perform its work at its facility, located on the La Quinta Ship Channel in the Port of Corpus Christi, Texas.

On October 22, 2005, the SBX-1 was moored at Kiewit's berth in the La Quinta Ship Channel for the radar-installation phase of the project. Mr. Roth, working for Basic Industries of South Texas (a subcontractor of Kiewit), was involved in scaffold building operations on the SBX-1. Mr. Roth began descending a fixed ladder on a leg of the platform when he lost his footing and fell, first striking a landing and then over the platform's guardrails to a barge floating 95 feet below. *See* OSHA Report, p. 6-7, Plaintiff's Motion to Remand Exhibit A (Docket No. 8). Upon landing, he suffered blunt head and chest trauma and died. *See id.*

## II.    PROCEDURAL HISTORY

On August 27, 2007, Plaintiffs sued Defendants in the 357th Judicial District Court in Cameron County, Texas for the injuries and subsequent death of Mr. Roth. On October 4, 2007, with the assent of the other Defendants, Boeing filed a Notice of Removal of Plaintiffs' suit to this Court (Docket No. 1), asserting original and exclusive federal subject matter jurisdiction pursuant to the Public Vessels Act, 46 U.S.C. §§ 31101, et. seq. (the "PVA") and the Suits in Admiralty Act,

46 U.S.C. §§ 30901, et. seq. (the "SAA").[1] On November 2, 2007, Plaintiffs filed a Motion to Remand, arguing that this is an ordinary state law negligence suit, not an admiralty suit, and that therefore, this Court lacks federal question jurisdiction (Docket No. 8). On November 21, 2007, Boeing filed a Response to Plaintiff's Motion to Remand (Docket No. 10), which was later joined by Kiewit and Raytheon (Docket Nos. 11 and 12 respectively). Keppel Amfels did not join Boeing's Response, but filed an Answer to Plaintiff's Original Petition on December 5, 2008 (Docket No. 13). On April 4, 2008, Plaintiff filed a Reply, along with a Supplemental Brief (Docket No. 30). Boeing's Sur-Reply followed on April 10, 2008 (Docket No. 32). No other Defendant filed a Sur-Reply. Thus, the issue of whether removal was proper is fully briefed and ripe for the Court's consideration.

## III. GENERAL REMOVAL PRINCIPLES

After a case is removed to federal court, 28 U.S.C. § 1447(c) provides two grounds for

---

[1] The PVA provides in pertinent part that:
**Waiver of Immunity.**– (a) In general.--A civil action in personam in admiralty may be brought, or an impleader filed, *against the United States* for--
(1) damages caused by a public vessel of the United States; or
(2) compensation for towage and salvage services, including contract salvage, rendered to a public vessel of the United States.

46 U.S.C. § 31102 (emphasis added). The SAA provides in pertinent part that:

> **Waiver of Immunity.**– (a) In general.--In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought *against the United States or a federally-owned corporation*. In a civil action in admiralty brought by the United States or a federally-owned corporation, an admiralty claim in personam may be filed or a setoff claimed against the United States or corporation.

46 U.S.C. § 30903 (emphasis added). Even where it waives sovereign immunity, the United States cannot be sued in state court. *See generally*, U.S. CONST. art. III, § 2; *see also, Great N. Life Ins. Co. v. Read*, 322 U.S. 47, 54 n. 6, (1944) (federal government's consent to suit against itself, without more, in a field of federal power does not authorize a suit in a state court). Thus, an admiralty suit brought against the United States under the PVA or SAA should be filed in federal court.

remand: (1) a defect in removal procedure and (2) lack of subject matter jurisdiction. *See Burks v. Amerada Hess Corp.*, 8 F.3d 301, 303 (5th Cir.1993); *see also Delgado v. Shell Oil Company*, 890 F.Supp. 1324, 1341 (S.D. Tex.1995). When considering a motion to remand the removing party bears the burden of showing that removal was proper. *See Willy v. Coastal Corp.*, 855 F.2d 1160, 1164 (5th Cir.1988), appeal after remand, 915 F.2d 965 (5th Cir.1990), aff'd, 503 U.S. 131 (1992). This extends not only to demonstrating a jurisdictional basis for removal, but also necessary compliance with the requirements of the removal statute. *See Albonetti v. GAF Corporation-Chemical Group*, 520 F.Supp. 825, 827 (S.D. Tex.1981). Since removal jurisdiction "raises significant federalism concerns," *Willy*, 855 F.2d at 1164, courts must construe removal statutes "narrowly, with doubts resolved in favor of remand to the state court." *See Jefferson Parish Hosp. Dist. No. 2 v. Harvey*, 788 F.Supp. 282, 283-84 (E.D. La.1992). If there is any doubt that a right to removal exists, ambiguities are to be construed against removal. *See Samuel v. Langham*, 780 F.Supp. 424, 427 (N.D. Tex.1992).

## IV.   LAW AND ANALYSIS

This Motion to Remand requires the Court to address two questions: whether Plaintiffs could have originally filed this suit in federal court, and if so, whether the suit is one that may be removed to federal court. *See* 28 U.S.C. § 1441.

### A.   Plaintiff's Suit Sounds in Admiralty

Plaintiffs contend that "this suit involves the death of a non-seaman/crew member performing non-maritime activities on a vessel that was not in navigable waters," and thus does not sound in

admiralty.[2] Plaintiff's Motion to Remand (Docket No. 8, p. 3). Federal admiralty jurisdiction flows initially from the Constitution, which extends federal judicial power "to all Cases of admiralty and maritime Jurisdiction." U.S. CONST., art. III, § 2; *see also Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 531-32 (1995). Pursuant to that power, Congress gave the district courts original and exclusive jurisdiction of "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1) ("Section 1333(1)"). Traditionally, the test for admiralty tort jurisdiction asked only whether the tort occurred on navigable waters. *See Grubart*, 513 U.S. at 531-32. If it did, admiralty jurisdiction existed; if not, admiralty jurisdiction did not exist. *Id.* The jurisdictional rule was changed, however, in three decisions of the Supreme Court aimed at clarifying the outer boundaries of maritime jurisdiction.[3] *Id.* at 532-33. Today, the test for admiralty tort jurisdiction is two-pronged. It requires that the incident (1) occur on navigable waters, and (2) have a substantial relationship to traditional maritime activity. *See Grubart*, 513 U.S. at 533-34.

The location requirement is easily satisfied in this case. The United States Coast Guard

---

[2] Plaintiffs also argue that the PVA and SAA do not apply to this suit, and thereby strip this court of federal question jurisdiction, because the SBX-1 was under construction, and thus not yet a "vessel," within the meaning of the PVA at the time Mr. Roth's accident occurred on October 22, 2005. *See* Plaintiff's Motion to Remand (Docket No. 8, p. 4). In the alternative, Plaintiffs contend that the even if the SBX-1 is a vessel, it was not yet a "public" vessel, owned by the government and under its control, as the PVA and SAA require. *See* Plaintiff's Reply Brief (Docket No. 16, p. 6-8). Because the Court finds that the instant case is not removable on grounds other than the SBX-1's status as a "public vessel," the Court does not need to reach the merits of either of these claims. Previous writings of this Court, however, refer to the SBX-1 as a vessel. *Cf. Gonzalez v. United States*, No. 06-CV-196 (S.D. Tex. Jun. 17, 2008) ("The SBX-1 is a twin-hulled, semi-submersible vessel developed for the United States' Ground-Based Midcourse Defense Program").

[3] *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972) (no admiralty jurisdiction where tort claims arose out of the wreck of an airplane that collided with a flock of birds and fell into navigable waters of Lake Erie); *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982) (conferring admiralty jurisdiction where tort claims arose out of collision of two pleasure boats in a navigable river estuary); and *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990) (conferring admiralty jurisdiction over tort claims arising out of a fire, caused by a defective washer/dryer aboard a pleasure boat docked at a marina, that burned the boat, other boats docked nearby, and the marina itself).

regulations define "navigable waters" as "those waters that are subject to the ebb and flow of the tide and/or are presently used, or have been used in the past, or may be susceptible for use to transport interstate or foreign commerce." 33 CFR § 329.4 (1986). The test of navigability in law is navigability in fact; that is, whether in its natural and ordinary condition a waterway is used, or is susceptible to being used, as a highway for commerce. *See State of Oklahoma v. State of Texas*, 258 U.S. 574, 585 (1922). At the time Mr. Roth lost his footing on SBX-1's ladder, the SBX-1 was moored at Kiewit's berth in the La Quinta Ship Channel, a waterway in the Port of Corpus Christi. Kiewit's neighbor on the La Quinta Ship Channel is an aluminum plant that receives bauxite by ship for smelting. Because the incident transpired on a vessel in the La Quinta Ship Channel, and that Channel is clearly used to "transport interstate commerce," the Court holds that Mr. Roth's death occurred in a navigable waterway. 33 CFR § 329.4 (1986); *cf. U.S. v. Reynolds Metals Co.*, 359 F. Supp. 338, 338-39 (S.D. Tex. 1973) (referring to the La Quinta Ship Channel as a navigable waterway of the United States in context of a criminal case).

In determining whether a sufficient connection with maritime activity exists to warrant federal jurisdiction, a court asks (1) whether the incident had a potentially disruptive impact on maritime commerce; and (2) whether the general character of the activity giving rise to the incident showed a substantial relationship to traditional maritime activity. *See Coats v. Penrod Drilling Corp.*, 61 F.3d 1113, 1118-19 (5th Cir. 1995) (citing *Grubart*, 513 U.S. at 534).

As to the first inquiry, a disruptive impact on maritime commerce, Plaintiffs assert that Mr. Roth's fall "did not require movement of the SBX-1 or affect any other vessels." Plaintiffs' Reply Brief (Docket No. 16, p. 13). The Fifth Circuit, however, has held that worker injuries, particularly those involved in repair and maintenance, can impact maritime commerce in a disruptive manner

by stalling or delaying the primary activity of the vessel. *See Coats*, 61 F.3d at 1119. Moreover, for purposes of determining jurisdiction, the focus is not on the incident's actual effect on maritime commerce, but upon its *potential* effect. *See Hufnagel v. Omega Service Indus. Inc.*, 182 F.3d 340, 352 n.9 (5th Cir. 1999) (emphasis added). In *Coats*, the plaintiff suffered a severe knee injury when a jack-up vessel's bullplug failed during a pressure test conducted while the vessel was sitting in navigable waters. *See Coats,* 61 F.3d at 1117. On these facts, the Court found a potentially disruptive impact on maritime commerce existed. *Id.* at 1119. Similarly, Mr. Roth's accidental death might have disrupted the radar installation aboard the SBX-1 and other operations in the La Quinta Ship Channel for a period of time to accommodate OSHA's investigation. Thus, a potential disruptive impact on maritime commerce existed here. *See Coats,* 61 F.3d at 1119.

As to the second inquiry, a substantial relationship to maritime activity, Plaintiffs assert that Mr. Roth was a "scaffold builder" with "no training or experience as a seaman." Plaintiffs' Reply Brief (Docket No. 16, p. 10-12). They further assert that "climbing a ladder is not a task somehow unique to maritime service or work traditionally done by seaman." *Id.* In the Fifth Circuit, the work of an injured plaintiff does not determine whether a substantial relationship to traditional maritime activity exists. *See Coats*, 61 F.3d at 1119. Instead, a court asks whether the *tortfeasor's* activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the case at hand. *See id.* (citing *Grubart*, 513 U.S. at 539). The plaintiff in *Coats* was involved in the maintenance of a jack-up drilling rig on navigable waters. *See Coats*, 61 F.3d at 1119. The Court held that this was "certainly a traditional maritime activity." *Id.* In this case, the SBX-1 was at Kiewit's facility undergoing installation of a radar and further modifications required to convert the

vessel from an oil drilling rig into a sea-based radar carrier.

The Fifth Circuit has not yet decided whether a vessel conversion constitutes traditional maritime activity, though repairs and maintenance clearly count as traditional maritime activity. *See Coats*, 61 F.3d at 1119; *see also Hughes v. LaBorde Marine Lifts, Inc.*, No. 06-9133, 2007 WL 3124681, at *3 (E.D. La. Oct. 22, 2007). Initially, the Court notes that vessel conversions share much in common with repair and maintenance work. Converting a vessel to a new use involves non-seaman workers coming aboard a vessel to perform various tasks normally beyond the expertise or ability of ordinary seamen. They are likely carried out because they are cheaper than building or buying a new vessel. Finally, the actual work done during a repair might be identical to that done in a conversion, especially if the repair involves the replacement of old parts. For these reasons, assuming all other factors are present, this Court finds no basis for excluding vessel conversions from the realm of traditional maritime activity.

The closest factual scenario to the instant suit found by this Court is *Alderman v. Pacific Northern Victor, Inc.*, 95 F.3d 1061, 1065-66 (11th Cir. 1996). There, a ship docked in navigable waters in southern Florida was undergoing a conversion from an oil drilling vessel to a fish processing vessel. *Id.* at 1063. The plaintiff was a carpenter assisting in the installation of an elevator aboard the ship when he slipped in fish oil and fell. *Id.* In finding that a substantial connection to traditional maritime activity existed, the Eleventh Circuit distinguished these facts from the facts of *Penton v. Pompano Construction Co.*, 976 F.2d 636 (11th Cir. 1992). *Id.* at 1065. In *Penton*, the plaintiff operated a construction crane mounted on a barge which offloaded rocks from other supply barges and placed the rocks to create a 150-foot-long jetty. *Id.* The court found an insufficient connection to traditional maritime activity, and explained that the barge from which

the plaintiff operated was essentially used as a platform to perform "water-side construction" of the jetty. *Id.*

The Court finds the facts of this case more closely resemble *Alderman*, and that a substantial connection to maritime activity exists here. As a preliminary matter, the SBX-1, like the vessel in *Alderman*, was being converted from an oil drilling vessel to perform a new function. Moreover, at the time he fell, Mr. Roth was assisting in that conversion by constructing scaffolding along one of the SBX-1's legs. He was not using the SBX-1, like the plaintiff in *Penton*, to construct some other object, like a jetty. Plaintiffs err in relying on *Molett v. Penrod Drilling Co.*, 826 F.2d 1419 (5th Cir. 1987), because its test for a maritime connection, which looks in part to *actual* impact, has since been abrogated by the Supreme Court in *Grubart*. *See Grubart*, 513 U.S. at 544. Since both prongs of the federal admiralty tort jurisdiction test are satisfied, the Court holds that Plaintiffs could have originally filed this suit in federal court. The Court now examines whether Plaintiff's federal admiralty suit is removable.

    **B.**    **Plaintiff's Suit is Not Removable**

        **1.**    **The Impact of 28 U.S.C. §§ 1331 and 1441**

Congress gave the district courts original and exclusive jurisdiction over "any civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." 28 U.S.C. § 1333(1). The Supreme Court has interpreted this statute to mean that state courts may not provide a remedy *in rem* for any admiralty suit. *See American Dredging Co. v. Miller*, 510 U.S. 443, 446-47 (1994). The saving to suitors clause, however, allows an *in personam* action to be instituted in state court or in federal court under diversity or maritime jurisdiction. *See Red Cross Line v. Atl. Fruit Co.*, 264 U.S. 109, 123, 44 S.Ct. 274, 68 L.Ed. 582

(1924). Plaintiffs filed suit against the Defendants *in personam*, and therefore, Plaintiffs' suit in state court was proper as filed. Defendants bear the burden of showing that removal is proper. *See Willy*, 855 F.2d at 1164.

> The federal statute governing removal is 28 U.S.C. § 1441; it provides in pertinent part that:
>
> **(a)** Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants, to the district court of the Untied States for the district and division embracing the place where such action is pending. . . .
>
> **(b)** Any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the Constitution, treaties or laws of the United States shall be removable without regard to the citizenship or residence of the parties. Any other such action shall be removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought. . . .

28 U.S.C. § 1441. Generally, cases arising under federal law are also removable under the first sentence of Section 1441(b). Although federal in nature, admiralty claims are treated differently. To avoid rendering the saving to suitors clause in Section 1333(1) statutory surplusage, the Supreme held that admiralty claims do not fall within the scope of the original federal jurisdiction statute, 28 U.S.C. § 1331. *See Romero v. Int'l Terminal Operating Co.*, 358 U.S. 354, 371-72 (1959) (the "historic option of a maritime suitor pursuing a common-law remedy to select his forum, state or federal, would be taken away by an expanded view of 28 U.S.C. § 1331"). Adopting this view, the Fifth Circuit has held that suits in admiralty, whether designated *in rem* or *in personam*, do not fall within the category of cases arising under the Constitution, treaties or laws of the United States. *See In re Mitchell Dutile*, 935 F.2d 61, 63 (5th Cir. 1991) (citing *Romero*, 358 U.S. at 378). Instead, admiralty and general maritime claims fall within the category of "[a]ny other [civil] action"

governed by the second sentence in Section 1441(b). *Id.* As such, they are "removable only if none of the parties in interest properly joined and served as defendants is a citizen of the State in which the action is brought." 28 U.S.C. § 1441(b). The practical effect of these provisions is that the instant suit is removable only if complete diversity of citizenship exists. *See In re Mitchell Dutile*, 935 F.2d at 63. Plaintiffs' Original Petition shows that the parties are not completely diverse (Docket No. 1, Exhibit 1). Plaintiffs are residents and citizens of the State of Texas, and Defendant Keppel Amfels is registered as a Texas corporation. *Id.* Hence, this suit lacks any ground on which it can be removed to federal court. *In re Mitchell Dutile*, 935 F.2d at 63.

Defendants seek to defeat the fatal impact of Section 1441(b) on their Notice of Removal in two ways. First, they claim that the United States is a party in interest to this suit within the meaning of Section 1441(b). Defendants assert that since the United States cannot be sued in state court, only a federal court can hear this case. Second, Defendants contend that as defense contractors, they are "agents" of the United States. Under this logic, this suit would be deemed a suit in admiralty against an arm of the United States government, the PVA and SAA would apply to waive immunity, and again, forbid a state court from presiding over this case. Defendants' arguments, although creative, are without merit. The Court addresses each in turn.

### 2. The United States is Not a Party in Interest to this Suit

The United States is not currently a named party in this law suit. Notwithstanding that fact, if the judgment sought would expend itself on the public treasury, interfere with the public administration, or restrain the government from acting or compel it to act, a suit will be construed as one against the United States. *See Bank One, Texas, N.A. v. Taylor*, 970 F.2d 16, 33 (5th Cir. 1992) (Federal Deposit Insurance Corporation is an instrumentality of the United States and when

named in suit, United States is party in interest). Defendants do not, and cannot, argue that Plaintiffs' suit would restrain or compel the Government. Plaintiffs have not sued the United States or any instrumentality thereof. Further, Plaintiffs seek tort damages only, not injunctive relief or specific performance on a contract. Even more telling, Defendants have not sought to sue the United States or any instrumentality thereof, and do not allege that the United States must indemnify them for any money judgment awarded should Plaintiffs prevail. Indeed, Defendants fail to state *any* facts supporting their argument that any judgment in this case would eventually have to be paid out of the public treasury. Accordingly, the United States is not a party in interest to this suit.

### 3. Defendants Lack Derivative Sovereign Status

Defendants claim that their agency relationship with the Department of Defense places them in the same shoes as the sovereign, such that a suit against them is not meaningfully different from a suit against the United States. *See* Defendant's Notice of Removal (Docket No. 1, p. 2). Their argument continues that since suits against the United States must be brought in federal court, a suit in admiralty against Defendants must likewise be brought in federal court. *See* 46 U.S.C. §§ 31101, et. seq. and 46 U.S.C. §§ 30901, et. seq. As Defendant's Notice of Removal and subsequent briefs provide neither argument nor authority on this point (Docket Nos. 1, 10, and 26), the Court would be within its discretion to reject the claim on that ground alone. *See United States v. Stevens*, 487 F.3d 232, 242 n. 1 (5th Cir. 2007) (inadequately briefed issues are deemed abandoned). Nonetheless, because there is little case law on this unique doctrine, and none in the Fifth Circuit, the Court, out of an abundance of caution, addresses the Defendants' claim.

Before doing so, the Court pauses to clarify that Defendants do not assert that sovereign immunity bars Plaintiffs suit against them; the PVA and SAA exist precisely to waive that immunity

where the *United States* is actually sued in admiralty. Rather, Defendants wish to use their relationship with the United States, via the Department of Defense, to trigger the PVA and SAA, and thereby provide a factual/legal vehicle to remove this suit to federal court. The Court, in analyzing this claim, looks to case law concerning extensions of *sovereign immunity* to private entities because that rationale applies with equal force to extensions of *sovereign status*. Inherent in the decision to extend sovereign immunity stands the requisite determination that a private entity is, in fact, an arm of the government.

The doctrine of sovereign immunity insulates the government from suit, and as such, is appropriately cabined. *See Keifer & Keifer v. Reconstr. Finance Corp.*, 306 U.S. 381, 388 (1939). For that reason, private agents or instrumentalities of the government do not normally become conduits through which sovereign immunity flows merely because they do the government's work. *Id.* The situations where private organizations have benefitted from "derivative sovereign immunity" are largely limited to those corporations created by a specific act of Congress. *See, e.g.*, 12 U.S.C. §§ 1811 et seq. (establishing the FDIC); *cf. Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 19 (1940) (finding sovereign immunity applied to defense contractor hired to improve navigation of Missouri River, under direction of the Secretary of War, as authorized by an act of Congress). Here, of course, Defendants do not claim to be government-owned corporations originated by an act of Congress. Federal courts have developed two methods for determining whether a private entity is entitled to federal sovereign immunity outside the context of congressionally-formed corporations.

### a. The *Boyle* Test

The first method is a two-part test announced by the Supreme Court in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988) in the context of government contractors claiming

immunity under the Federal Employees Liability Reform and Tort Compensation Act (the "FTCA"), 28 U.S.C. §§ 1346, et seq. That test provides that federal common law displaces state tort law if (1) the matter involves a uniquely federal interest, and (2) there is a significant conflict between the federal interest or policy and the operation of state law, or the application of state law must frustrate specific policy objectives of federal legislation. *Id.* at 507.

The district court in *Adams v. Alliant Techsystems, Inc.* 201 F. Supp. 2d 700, 706-08 (W.D. Va. 2002) applied the two-part *Boyle* test to a claim by government contractors overseeing an Army munition plant that they were shielded from workers' suits for negligent exposure to excessive noise. The court found that the production of munitions for the Army was a uniquely federal interest, but that Virginia's personal injury law did not conflict with that interest. *Id.* at 707. There was no conflict because the government contractor could comply with both its contractual obligations to manage the plant and the state-prescribed duty of care. *Id.* This was in contrast with *Boyle*, where a helicopter manufacturer was held to be immune from a state law design defect claim by the parent of a United States Marine pilot killed in a helicopter crash. *See Boyle*, 487 U.S. at 512. Requiring the helicopter manufacturer to comply with both the government manufacture specifications and state-law products liability standards would significantly interfere with federal policy. *Id.* at 511.

As in *Adams*, this Court finds that the conversion of an oil drilling rig into a missile tracking radar carrier for the U.S. Department of Defense's Missile Defense Program is uniquely a federal interest. *See Adams*, 201 F. Supp. 2d at 707. In addition, the Court finds that like the defendants in *Adams*, the Defendants here fail to demonstrate that a "Sophie's choice" exists between the duty of care Defendants owed their employees and Defendants' regulatory or contractual obligations. *Id.* Therefore, defendants fail to prevail on *Boyle's* second prong. *See Boyle*, 487 U.S. at 507.

b.     **The State Sovereign Immunity Test**

The second approach for determining whether a private organization is entitled to federal sovereign immunity requires a district court to apply the test for state sovereign immunity, as developed by the circuit in which it sits. The Fifth Circuit has not expanded the use of its *state* sovereign immunity test to evaluate a private entity's eligibility for *federal* sovereign status/immunity. *See, e.g., United States v. Deloitte & Touche, LLP*, 381 F.3d 438, 440 (5th Cir. 2004) (employing six factor test to resolve a defendant's Eleventh Amendment claim). The six factors employed by the Fifth Circuit when evaluating an Eleventh Amendment claim are:

1. Whether the state statutes and case law view the agency as an arm of the state;
2. The source of the entity's funding;
3. The entity's degree of local autonomy;
4. Whether the entity is concerned primarily with local as opposed to statewide problems;
5. Whether the entity has the authority to sue and be sued in its own name; and
6. Whether the entity has the right to hold and use property.

*Id.* (citing *Hudson v. City of New Orleans*, 174 F.3d 677, 679 (5th Cir. 1999) (summarizing six factor test developed in *Clark v. Tarrant County*, 798 F.2d 736, 744-45 (5th Cir. 1986))).

The Sixth Circuit, however, did use its state sovereign immunity test to address the question of whether a private organization was entitled to federal sovereign immunity in *Parrett v. Southeastern Boll Weevil Eradication Foundation*, No. 04-5521, 2005 WL 3065967, at *4 (6th Cir. Nov. 15, 2005). In that case, a company established to eradicate boll weevils, ("Southeastern"), was sued by one of its employees for wrongful termination, and sought to have the action dismissed on sovereign immunity grounds. *Id.* at *1. Since the Sixth Circuit lacked a clear test for *federal* sovereign immunity, the Circuit upheld a district court's application of the Sixth Circuit test for *state* sovereign immunity. *Id.* at *3. The Sixth Circuit's test for determining whether a private entity is

-15-

entitled to state sovereign immunity is notably similar to the Fifth Circuit's test outlined above. *See Parrett*, 2008 WL 3065967, at *3. The Sixth Circuit's test considers:

> (1) whether the state would be responsible for judgments against the organization;
> (2) how state law defines the organization;
> (3) the state's degree of control over the organization and its board of directors;
> (4) the organization's source of funding; and
> (5) whether the organization's functions are of a traditional state government nature.

*Id.* (citing *Earnst v. Rising*, 427 F.3d 351 (6th Cir. 2005) (en banc)). In favor of finding that Southeastern was entitled to derivative sovereign status, the Court noted that thirty percent of Southeastern's funding came from the federal government, and that Southeastern performed traditional government function in the form of suppressing agricultural pests. *Id.* at *4-6. However, the Court found these facts to be outweighed by several others, namely that: (1) there was no indication that the federal government would be responsible for paying a judgment against Southeastern; (2) Southeastern did not seek legal representation from the Government upon receipt of the plaintiff's complaint and was represented by private counsel for the duration of the suit; (3) Southeastern was not created or defined by a special law that would indicate its status as an arm of the government; and (4) the federal government exercised little control over the leadership or day-to-day functions of Southeastern. *Id.* As a result, the Court refused to confer federal sovereign immunity upon Southeastern. *Id.* at *6.

Whether this Court applies the test from the Fifth Circuit or the Sixth Circuit, Defendants fail to qualify for sovereign status. Neither Boeing nor any of the other Defendants to this suit have indicated that the federal government is responsible for paying a judgment against them. They are each represented by private counsel. Based on the filings with this Court, none of the Defendants receive federal "funding" outside being paid for their contractual services. Nor were the companies

created by an act of Congress, indicating that they are not arms of the government. They are private companies that sometimes perform work for the government, but often times perform work for private customers. And while the government may exercise significant control over the SBX-1 project, that does not mean the government exercises control over the defendant companies themselves. Finally, Defendants have the right to sue, and to be sued, in their own name, further indicating their autonomy from the United States.

Defendants clearly do not qualify as derivative sovereigns under either the *Boyle* or *state sovereign immunity* tests. As such, the Court finds it unnecessary to settle the question of which test for sovereign status should apply in the instant case. It is sufficient that neither method establishes a ground for Defendants to remove this suit to federal court.

## V.   CONCLUSION

The nature of Plaintiffs' suit is an *in personam* admiralty civil action against a defense contractor and several defense subcontractors arising out of the accidental death of Mr. Roth while working on board the United States-owned vessel, the SBX-1. State courts have concurrent jurisdiction over suits of this nature; thus Plaintiffs were free to file their claim – as they did – in a Texas state court. Although there is original federal admiralty jurisdiction, Section 1441(b) of the federal removal statute prohibits removal of this suit except where complete diversity of citizenship between the parties exists. Since there is no diversity of citizenship, and no jurisdiction established under the PVA or SAA, the Court hereby **GRANTS** Plaintiff's Motion to Remand.

Plaintiffs seek to recover their reasonable costs and expenses associated with the removal and remand proceedings. The Court finds that the Defendants were not objectively unreasonable in believing that removal was legally proper since admiralty suits are federal in nature. *See Hornbuckle*

*v. State Farm Lloyds*, 385 F.3d 538 (5th Cir. 2004) (finding that appellants had objectively reasonable grounds for believing removal was proper). Therefore, the Court **DENIES** Plaintiff's Motion for Costs and Attorney's Fees, and **ORDERS** each party to bear their own costs related to these removal and remand proceedings.

All other pending motions, including Defendant Keppel Amfels' Motion for Summary Judgment, are **DISMISSED AS MOOT**.

**Signed** this 4th day of December, 2008.

Andrew S. Hanen
United States District Judge